## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SSC SERVICE CORP. d/b/a SSC SERVICE SOLUTIONS,** | |
| **Plaintiff,** | Civ. No. 2:15-cv-4160-KM-MAH |
| **v.** | |
| **EDWARD TUREN, NEAL TUREN, CONTROL TFS WEST, INC., CONTROL FACULTY SERVICES, LLC, CONTROL EQUITY GROUP, INC., JOHN DOES 1-10, and ABC/XYZ CORPS. 1-10,** | **OPINION** |
| **Defendants.** | |

## MCNULTY, U.S.D.J.:

The plaintiff, Southeast Service Corporation ("SSC"), rendered services to Control TFS West, Inc. ("TFS"), which allegedly breached its contract with SSC by failing to pay for two consecutive months. SSC seeks an action against TFS, affiliated entities, and its two ultimate shareholders individually for various common law and statutory claims. Defendant Neal Turen ("Neal," to distinguish him from his brother, defendant "Edward") is the minority shareholder of TFS's parent entity. In a prior opinion (DE 52), I denied cross-motions for summary judgment on Count I of the complaint, which involves the viability and scope of an alleged prior settlement.

This, a second motion for summary judgment filed by Neal, addresses the remaining counts of the complaint, Counts II through VIII. The question presented is whether the contractual liability of TFS should flow to Neal *via* various theories, including piercing the corporate veil. Neal seeks dismissal of these counts as against himself, asserting that SSC has not adduced evidence sufficient to create a factual issue on the issue of Neal's liability. For the reasons herein, Neal's motion will be granted in part and denied in part.

1

# I. Background[1]

Defendant Neal Turen is a minority shareholder in a variety of affiliated entities. Specifically, he is a 33% owner, either directly or indirectly, of each of the defendant entities: Control TFS West, Inc. ("TFS"), Control Facility Services, LLC ("Control Facility"), and Control Equity Group, Inc. ("CEG"). (TFS, Control Facility, and CEG are referred to collectively as the "Control Defendants".) (DSMF ¶ 1). Neal's brother, Edward, is the majority owner of those entities. (*Id.* ¶ 2). Neal and Edward are also shareholders in other affiliated entities (the "Affiliated Control Entities") that were parties to a loan and security agreement with TD Bank (the "TD Bank Loan").[2] (*Id.* ¶ 3).

---

[1]    For purposes of this motion, I consider Defendant Neal Turen's statement of material facts ("DSMF") (ECF no. 66-4), Plaintiff SSC's responsive statement of material facts ("PRSMF") (ECF no. 69), Plaintiff SSC's supplemental statement of material facts ("PASMF") (ECF no. 69-2), as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

Record items cited repeatedly will be abbreviated as follows:

Compl.= Complaint (ECF no. 1)

Lipman Cert. = Certification of Matthew A. Lipmman (counsel for Plaintiff) (ECF no. 69-3)

2014 Midkiff Rprt. = 2014 report by Kyle Anne Midkiff, CPA (expert witness for Plaintiff) (ECF no. 69-3, Exh. A)

2018 Midkiff Rprt. = 2018 report by Kyle Anne Midkiff, CPA (expert witness for Plaintiff) (ECF no. 69-3, Exh. B)

Di Iorio Decl. = Declaration of John P. Di Iorio (counsel for Defendant Neal Turen) (ECF no. 66-2)

Neal Decl. = Declaration of Defendant Neal Turen (ECF no. 66-3)

Pl. Br. = Plaintiff SSC's brief in opposition to defendant's motion (ECF no. 69-1)

Def. Br. = Defendant Neal Turen's brief in support of summary judgment (ECF no. 66-1)

Reply Br. = Defendant Neal Turen's reply brief (ECF no. 70)

[2]    The TD Bank Loan, an $18 million revolving credit facility (consisting of the loan and security agreement along with related documents) is central to the case. The parties to the loan agreement, dated December 23, 2011, were Control Building Services, Inc., Control Security Services, Inc., Absolute Security Network, Inc., Control Engineering Services, Inc., TFS, CEG, Control TFS East Inc., Oxford Building Services, Inc., Oxford Building Services/DDR, Inc., Control ESI, Inc., Control Capitol Security

The corporate structure of the Affiliated Control Entities has not been laid out clearly by either party. Control Building Services, Inc. ("CBS") appears to be one of the top-level entities, of which Neal holds a third of the shares. (Lipman Cert., Exh. D at 7). CEG, which was not owned directly by Neal and appears to be a subsidiary of CBS, served as the management arm of the Affiliated Control Entities. (Lipman Cert., Exh. F at 20:8-21). TFS, based in Phoenix, was in turn a subsidiary of New Jersey-based CEG. (Lipman Cert., Exh. E at 16:14-24).

TFS at all relevant times was contractually obligated to provide housekeeping and janitorial services to shopping centers owned by Macerich Partnership, L.P. ("Macerich"). TFS and SSC entered into an agreement whereby SSC, as TFS's subcontractor, agreed to actually perform those services. (DSMF ¶ 13).[3]

The business relationship between TFS and SSC proceeded without incident for several years. Each month, Macerich paid TFS for the services. SSC performed the services, billed TFS monthly, and was paid monthly by TFS. However, in 2012, TFS failed to make two consecutive monthly payments to SSC, totaling $3,049,501.16. (*Id.* ¶ 31). In addition, according to SSC, TFS wrongly took $2.5 million in discounts for early payment, even though TFS in fact failed to pay early. (*Id.* ¶ 32).

These basic facts, and the contractual liability of TFS, appear to be undisputed, at least at this point. The issue on this motion is whether, *via* piercing of the corporate veil or some other theory, that liability should flow to Neal individually.

---

Services, LLC, Control Staffing Solutions Inc., Origin Construction Services, Inc., Control Environmental Services, Inc., and TD Bank, N.A. (Di Iorio Decl. at 43).

3      Actually, in March 2006, it was Control Facility which entered into the subcontract with Plaintiff SSC. (DSMF ¶ 13). Thereafter, Control Facility assigned its rights under the subcontract to TFS. (*Id.* ¶ 14). I ignore that complication, which does not affect the issues here.

On the issue of Neal's potential liability, there is considerable factual disagreement regarding the extent of Neal's role in the Affiliated Control Entities and the operation of the TD Bank Loan.

Neal claims that his relationship with his brother, Edward, was strained and that Neal had little management responsibility or authority over the Affiliated Control Entities. (DSMF ¶¶ 4-12). SSC responds that Neal understates his role with the Affiliated Control Entities. According to SSC, Neal connived in the commingling of funds among the various Affiliated Control Entities, funds which were ultimately used to benefit him personally. (PSMF ¶¶ 45-48).

Neal claims that the TD Bank Loan required TFS to "sweep" all of its income into an account titled to CEG (the "Concentration Account"). (DSMF ¶ 21). That Concentration Account, Neal says, was used to pay off the TD Bank Loan, but he had no involvement in the Concentration Account's administration. (*Id.* ¶¶ 24-29). SSC responds that while the money was in fact swept into the Concentration Account, the loan agreement did not require such sweeps. (PSMF ¶ 25).

In 2012, the parties litigated their contract dispute in a prior action. *Control TFS West, Inc. v. Southeast Services Corp.*, Docket No. 12-cv-5321. There was a settlement agreement, or so the parties believed.

On June 18, 2015, SSC filed a complaint in this Court against Edward Turen, Neal, the Control Defendants, John Does 1-10, and ABC/XYZ Corps. 1-10, asserting eight claims:

Count I- Breach of Contract
Count II- Piercing the Corporate Veil (Alter Ego Liability)
Count III- Piercing the Corporate Veil (Participation Theory Liability)
Count IV- Fraudulent Transfers under N.J. Stat. Ann. 25:2-25(a)
Count V- Fraudulent Transfers under N.J. Stat. Ann. 25:2-25(b)
Count VI- Fraudulent Transfers under N.J. Stat. Ann. 25:2-27(a)
Count VII- Breach of Fiduciary Duty
Count VIII- Unjust Enrichment

(Compl. ¶¶ 41-103).

Count I concerns the breach of contract claim as between SCS and TFS. By earlier cross-motions for summary judgment on Count I, the parties disputed the effect of the earlier settlement agreement—specifically, whether liability would be apportioned, or whether the liability of Neal and Edward was joint and several. Because there were issues of fact as to whether the parties had reached agreement on that issue, I denied both sides' motions as to Count I. (*See* DE 52).

On June 7, 2019, Neal filed the current motion for summary judgment on Counts II through VIII, which seek to hold Neal liable by indirect means—piercing the corporate veil, and so forth. Neal's motion seeks dismissal of those counts insofar as they relate to Neal individually. (ECF No. 66). On July 22, 2019, SSC filed papers in opposition. (ECF No. 69). On August 8, 2019, Neal filed a reply in further support of his motion for summary judgment. (ECF No. 70). For the reasons below, that motion for summary judgment is granted in part and denied in part.

## I. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to

the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met the threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine issues of material fact exist). In deciding a motion for summary judgment, the court's role is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## II. Discussion

### A. Count II: Alter Ego Liability

In Count II, SSC asserts that Neal, along with Edward Turen, so dominated the Affiliated Control Entities that they essentially served as alter egos of those individuals. On that theory, the individuals should be held responsible for those companies' liabilities. (Compl. ¶¶ 46-47).

New Jersey corporations are presumed to be entities separate from their shareholders. *Linus Holding Corp. v. Mark Line Industries, LLC*, 376 F. Supp. 3d 417, 424-425 (D.N.J. 2019) (quoting *State Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983)). Veil piercing is an equitable remedy "designed to remedy a fundamental unfairness" and is reserved for "extraordinary circumstances, such as fraud or injustice." *Id.*

6

(citations omitted). New Jersey law requires the satisfaction of two elements to pierce the corporate veil:

> **First**, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist.
>
> **Second**, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. However, even in instances where one individual shareholder or director dominates the corporate entity, liability generally is imposed only where the [dominant party] has abused the privilege of incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law. In determining whether a unity of interest and ownership exists under the first prong, the Third Circuit, applying New Jersey law, has utilized six non-binding factors to guide this inquiry:
>
>> [1] gross undercapitalization ...;
>>
>> [2] the failure to observe corporate formalities, non-payment of dividends,
>>
>> [3] the insolvency of the debtor corporation at the time,
>>
>> [4] siphoning of funds of the corporation by the dominant stockholder,
>>
>> [5] non-functioning of other officers or directors, absence of corporate records, and
>>
>> [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Fagan v. Fischer*, No. 14-7013, 2019 WL 5587286 at *23 (D.N.J. Oct. 30, 2019) (quotations and citations omitted; emphasis and line breaks added).

Generally, "the issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A. 2d 475, 498 (N.J. Super. Ct. App. Div. 2006) (citing *G-I Holdings, Inc. v. Bennett*, 380 F. Supp. 2d 469, 477-78 (D.N.J. 2005). The burden of proof that the veil should be pierced is on the party seeking the piercing. *Tung v. Briant Park Homes, Inc.*, 670 A. 2d 1092, 1096 (N.J. Super. Ct. App. Div. 1996) (citation omitted); *see also Fagan, supra* ("[T]he party seeking an exception to the fundamental

principle that a corporation is a separate entity from its principal bears the burden of showing that the court should disregard the corporate entity.").

What SSC seeks here, viewed in one way, is a two-step veil piercing—first through TFS to CEG and then through CEG to Neal. SSC's arguments lack precision as to the distinctions among the various Affiliated Control Entities. It essentially argues that the "Affiliated Control Entities" should be pierced through to Neal. But the Affiliated Control Entities comprise a variety of distinct corporate forms. Most of the arguments for veil piercing relate to the Turen brothers' use of CEG—not CBS, the entity which they directly own. Nonetheless, I can see that it would be inequitable to give too much weight to that fact. If, as SSC sees it, the Turens are circumventing corporate forms and using CEG as their personal piggy bank, then it might not be dispositive that it is actually CBS which owns CEG and that the Turens did not take money out of CBS. The Turens could still be employing CEG as an alter ego irrespective of the particular box that CBS occupies on the corporate organizational chart. *See In re Buildings by Jamie, Inc.*, 230 B.R. 36, 42 (N.J. Bkrpt. 1998) (discussing instances in which the corporate veil was pierced through to individuals, rather than a parent corporation). Therefore, the veil piercing factors can still be applied to CEG.

### 1. *Veil Piercing Analysis from TFS through to CEG*

The case for piercing the veil through TFS to CEG is fairly straightforward. According to SSC, TFS was completely at the mercy of CEG for its finances, and funds among the Affiliated Control Entities were inextricably commingled in a common account. Neither side disputes that TFS's income, upon receipt, was immediately transferred away from TFS and into the Concentration Account. (Neal Decl. ¶ 26-27).

SSC contends that there is no evidence that the TD Bank Loan benefited TFS in any way, and that TFS was not required to contribute its income to the Concentration Account from which the loan payments were allegedly made. (Pl. Opp. at 15). As evidence for these contentions, SSC points to TFS's contract with Macerich; the Cash Management Master Agreement with TD Bank (which

8

governs the sweeps into the Concentration Account); and two reports by Kyle Anne Midkiff, an accounting expert retained by SSC.

Information regarding the Macerich contract comes from a deposition of Edward Doyle, an executive at TFS. Macerich was TFS's only client from 2004 to 2013. (Lipman Decl., Exh. E, 14:13-17). TFS, recall, engaged SSC as subcontractor to perform housekeeping and janitorial services at Macerich's shopping centers. For those services, TFS generally billed Macerich monthly, and TFS then generally paid SSC.[4]

The Cash Management Agreement with TD Bank allowed CEG to administratively maintain accounts from which money would automatically be swept into the Concentration Account nightly. While Neal argues that this agreement *required* TFS to sweep all of its revenue away to the Concentration Account, SSC contends that the agreement merely *allowed* the sweeps. If SSC is correct, it could lead to the implication that the Turens affirmatively opted in to the sweeps in order to siphon away TFS's revenue and pay down debt for the benefit of other Affiliated Control Entities and themselves as guarantors. The underlying evidence is as follows.

TFS, along with the other Affiliated Control Entities, was a party to the TD Bank Loan Agreement. Karen Marx signed the agreement on behalf of TFS as its Vice President. (Di Iorio Decl. at 91). Neal signed the Agreement on behalf of several other Affiliated Control Entities. (*Id.*). Additionally, Neal, along with Edward, signed a Guaranty Agreement dated December 23, 2011, which "jointly and severally, guarantee[d] the unconditional and prompt payment (and performance) by the [Affiliated Control Entities] to [TD Bank, N.A.]" of the obligations under the Loan and Security Agreement. (*Id.* at 102). In short, Neal

---

[4]     There is a complication. It is not entirely clear from Doyle's deposition whether funds from Macerich were *always* received prior to TFS paying SSC, but the timing generally seems to fit. TFS billed Macerich at the beginning of the month (*id.* at 59:11-12), and would aim to pay SSC by the middle of the month (*id.* at 109:11-110:10). Drawing inferences in the non-movant's favor, I accept that the payments from Macerich were the source of the funds that TFS paid to SSC; in substance, Macerich was paying SSC, through TFS, to clean Macerich's shopping centers.

and Edward personally guaranteed the $18 million loan to the Affiliated Control Entities.

Appendix IV of the Cash Management Master Agreement provides for "TD Line of Credit Sweep Services." (Neal Decl., Exh. A at 30). It is not disputed that this agreement provided the mechanism by which revenue from TFS was used to pay down the TD Bank Loan balance. The sweeping of revenues was clearly contemplated by this Agreement with the bank. Neal does not point to any provision in any of the loan documents, however, that actually requires TFS to sweep all of its revenues into the Concentration Account. There is no evidence that the sweeping of revenues from these multiple interrelated entities was a condition of the loan.

Neal is essentially suggesting that, under the loan agreement, TFS was not merely permitted but required to commingle funds in the Concentration Account. SCS disagrees. As to the veil piercing issue, the dispute is relevant for the following reason: Under SCS's view, the Turen brothers deliberately commingled funds in the Concentration Account and used funds from TFS to use to pay down debts, to the benefit of CEG and the Turens; under Neal's view, the alter-ego inference is unwarranted, because the companies were simply complying with the conditions of a loan.[5] There is therefore at least a genuine dispute as to whether, as Neal says, TFS was required to commingle the funds with CEG. Indeed, the evidence—most pertinently, the relevant loan agreement itself—seems to go the other way. Neal cannot prevail on this issue on summary judgment.

---

[5]      In his reply brief, Neal argues that it was perfectly appropriate for these sweeps to occur, since TD Bank had a security interest in TFS's assets in conjunction with the TD Bank Loan, and a secured creditor has the right to be paid before unsecured creditors, such as SSC. But just because TD Bank would naturally want to be first in line, or even that it could claim priority in a bankruptcy proceeding, does not mean that it automatically had a right to all of TFS's revenue. Nor does it affect the veil piercing analysis of whether funds of the entities were commingled, or that this was done for their common benefit or the personal benefit of Neal and Edward as guarantors.

In addition to the sweeps, TFS paid millions of dollars in "management fees" to CEG. As described by CBS's auditors, CEG is "the management company that employs [the Affiliated Control Entities'] executives and pays the majority of the common corporate expenses. Generally, management fee allocations based on revenues are recorded to allocate the expenses to the various companies." (2014 Midkiff Rprt., Attachment 3 at 6). SSC argues throughout its briefing that the management fees are illusory—*i.e.*, a fraudulent means of draining TFS and moving its funds to CEG. Here, SSC focuses on deposition testimony indicating that CEG spent only a small percentage of its time "providing services" to TFS, but reaped approximately half of its management fees from TFS. (Pl. Br. at 35-36). Whether or not this rose to the level of fraud, it may serve as evidence that TFS and CEG did not observe corporate boundaries in commingling their funds.

I turn to the remaining factors in the Third Circuit's test. A jury could find that TFS was undercapitalized, since all of its revenues were immediately transferred away from its accounts. Indeed, funds were "siphoned" away daily. Additionally, each year, millions of dollars in "intercompany management fees" were withdrawn from TFS.[6] (2014 Midkiff Rprt. at 3, Attachment 6). On the undercapitalization issue, a jury would not have to accept SSC's interpretation, but it could.

SSC has brought forth deposition testimony indicating that corporate formalities were not observed. For example, Neal himself stated that he'd "be given titles from time to time, [and] not even know [he] had them." (Lipman Cert., Exh. C at 27:10-11). TFS did not maintain its own corporate records— they were held by a different Control Entity. (2014 Midkiff Rprt. at 7).

---

[6] According to SSC, the mechanism was that revenues were swept into the Concentration Account, and then when TFS needed to pay bills, money was transferred back to it from CEG. The management fees, in SSC's version, were not bona fide fees for services rendered. Rather, at the end of the year, the discrepancy between the amount of funds swept into the Concentration Account and the amount transferred back to TFS was simply recorded as "management fees." (Pl. Br. at 35).

These factors, along with the evidence of commingling of funds, are sufficient to raise an issue of fact as to the first prong, unity of interest and ownership of TSF and CEG. SSC has also raised a genuine dispute as to the second prong of the veil piercing analysis—whether the corporate form was being abused for fraud or injustice. The evidence shows that TFS had no money to pay its bills to SSC when they came due, the money having already been abstracted to CEG.

On this issue, summary judgment cannot be granted to Neal.

### 2. Veil Piercing Analysis for CEG through to Neal

I turn to the second step of the veil piercing analysis, *i.e.*, from CEG up to Neal.

With respect to the first prong, Neal claims that there cannot be unity of interest and ownership, in that he has been shut out of the business operations of the Affiliated Control Entities, including TFS. (Def. Br. at 16). Indeed, he says he was terminated from management positions in November 2013 and did not receive a salary for the 18 months prior. (*Id.*). Edward, the majority shareholder, really controlled the operations of the Affiliated Control Entities. (Neal Decl. ¶¶ 3-6). Neal also explains that he had nothing to do with TFS's operations, finances, or agreement with SSC. (*Id.* ¶ 7).

But it is not Neal's relationship with TFS that is specifically at issue at this step of the analysis. The issue here is whether Neal has been using CEG in such a way as to warrant the equitable remedy of veil piercing.

SSC brought forth evidence, discussed above, that the Affiliated Control Entities commingled their funds with each other. There is less evidence, however, that CEG was commingling funds with Neal. SSC does claim that corporate funds from the CEG entities were used to pay personal expenses for the Turen family. The evidence of that comes chiefly from Midkiff's 2018 report. CEG's general ledger shows a number of small payments by the company to Neal, allegedly for personal expenses. These amount to a few hundred dollars for "Light Bulbs," insurance premiums, and other payments. (2018 Midkiff Rprt. at 7, Attachment 3). Setting aside the relatively small sums, I observe

that this evidence consists largely of fairly non-specific entries in a general accounting ledger.

SSC argues that the amount of payments is not the issue—it is the fact that Neal used CEG to pay his personal expenses at all. Midkiff found, citing the general ledger, that Neal "charged personal expenses to the company that were recorded as loans to the shareholders." (2018 Midkiff Rprt. at 10).

More substantial is a distribution of more than $5.5 million to Neal from CEG's parent company, CBS, in 2009 (along with an approximately $11 million distribution to Edward, the 2:1 ratio reflecting their respective equity positions). This distribution (the "2009 distribution"), according to Midkiff, caused CBS's liabilities to exceed its assets. (2018 Midkiff Rprt. at 6-7).

Neal claimed in his deposition, somewhat vaguely, that this money somehow made its way back into the Affiliated Control Entities, and that he did not personally receive the money. (Lipman Cert., Exh. C at 84:13-85:23). Neal states in his declaration that the funds were in fact deposited upon closing into the Concentration Account. (Neal Decl. ¶ 15).

Neal also stresses that this money was not attributable to TFS, which never had a claim to it. (Reply Br. at 14). But that misses the point; the justification for veil piercing is not confined to facts that relate specifically to the underlying dispute between TFS and SSC. The purpose of this evidence is to show that Neal siphoned funds from the Affiliated Control Entities, and that the veil should accordingly be pierced through to him.

Nevertheless, Neal is essentially correct that the 2009 distribution is not really germane. The cash for this distribution seems to have come from CBS, not CEG. In the audit attached to the 2014 Midkiff report, the auditors explain that in 2009, CBS and Control Engineering Services, Inc. (another of the Affiliated Control Entities) "sold certain assets and liabilities" (housekeeping contracts, according to Neal). This sale yielded a gain of $14,749,928. (2014 Midkiff Rprt., Attachment 3 at 13). This does not quite add up to the distribution that Neal and Edward received from CBS, nor does it show that the money returned to the Concentration Account—and money, of course, is

fungible. Nevertheless, it does at least tend to negate the argument that the ultimate source of this distribution was CEG. And it is CEG, not CBS, as to which SSC tries to pierce the veil. There is no evidence of how any funds got from TFS or CEG to CBS, if they did.

I will now consider the Third Circuit factors as they relate to CEG. As for insolvency, SSC has adduced evidence that CBS's assets exceeded its liabilities in 2009. (2014 Midkiff Rprt. at 9, 2018 Midkiff Rprt. at 10). There is no further evidence that CEG was actually insolvent, in the sense of being unable to meet its obligations as they came due. Much of SSC's evidence that CEG ignored corporate formalities shows only that the subsidiary entities, such as TFS, lacked a formal board structure. But SSC has provided, in addition, Neal's statement that while he thought every company "had set up some sort of Board of Directors," there were no annual meetings, and that he did not even know which entities he was a director of. (Lipman Cert., Exh. C at 41:13-42:14). At least some funds, such as the personal payments paid to the Turens from the CEG general ledger, could be considered "siphoned" by the dominant stockholders. (2018 Midkiff Rprt. at 10, Attachment 3). SSC has not put forward evidence regarding the acts or functions of other officers and directors of CEG, nor does it point to an absence of corporate records. But the evidence of the company's paying personal expenses for the owners and recording the payments as loans (id.) would support an inference that the corporation was merely a façade for its shareholders, the Turens.

Neal of course has a competing version of his role in the Affiliated Control Entities. He points to evidence that his brother froze him out of a management role and that he, Neal, was as much a victim of Edward's machinations as was SSC. All SSC has to do to defeat Neal's motion for summary judgment, however, is raise a genuine issue as to this fact-dependent issue. That it has done. As to the unity and ownership of CEG with Neal, I find that a genuine issue of material fact does exist. A jury may not ultimately be persuaded that Neal ought to be held personally liable for the actions of CEG, but SSC has demonstrated a loose corporate structure in which funds were commingled,

and to some degree distributed to Neal. As to the second prong, I find that a genuine dispute exists as to whether piercing the veil is required to prevent injustice. As with TFS, CEG allegedly placed money out of reach of its subsidiary's creditors and used it to enrich its owners. If true, this would be unjust. SSC has put forward evidence suggesting this was the case. Arguments that Neal was not involved in the underlying dispute between TFS and SSC do not speak to the issue of alter ego liability.

SSC has demonstrated a genuine issue of material fact as to whether TFS was the alter ego of CEG and whether CEG was the alter ego of Neal. Summary judgment on Count II is therefore denied.

## B. Count III: Participation-Theory Liability

Neal seeks summary judgment on Count III. The crux of Plaintiff's "participation theory" liability claim is that CEG allegedly drained all of the revenues from TFS, rendering it unable to pay its creditors. This occurred through the sweeps into the Concentration Account and TFS's payment of "management fees" to CEG. On this motion, the issue again is Neal's liability for such corporate acts.

Under the participation theory of liability, corporate officers can be held personally responsible for intentional torts. *Saltiel v. GSI Consultants, Inc.*, 788 A. 2d 268, 272 (N.J. 2002). Liability requires some personal involvement in the tortious conduct. *Id.* ("[T]he essence of the participation theory is that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort."). "A predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct." *Id.* A failure to supervise does not constitute "sufficient involvement." *See North American Steel Connection, Inc. v. Watson Metal Products Corp.*, 515 F. App'x 176, 182 (3d Cir. 2013) (holding that status as a supervisor is insufficient for liability since it "ignores the element of the participation theory requiring that the corporation's breach

occurred by [the officer's] own conduct, and it is plainly contradicted by the principle of New Jersey law that a director does not incur personal liability for its torts merely by reason of his official character.") (internal quotations and citations omitted).

SSC argues that TFS and CEG misappropriated funds properly owed to it in the guise of management fees. It contends that Neal participated in these actions by virtue "of his duty as a director to monitor the corporate affairs and policies and to prohibit the misappropriation." (Pl. Br. at 32). I need not reach the issue of whether the payment of management fees from TFS to CEG was in fact tortious, because SSC has not put forward any evidence that Neal was involved in the decision to pay the fees. If failure to "monitor" were enough, liability would be virtually automatic. There is no evidence that Neal was involved in the payment of management fees by TFS to CEG. That is enough to defeat a "participation" claim against him.

*Francis v. United Jersey Bank*, 432 A. 2d 814 (N.J. 1981), cited by SSC, did in fact impose liability on a director for implicitly acquiescing in the corporation's misappropriation of funds. There, however, liability did not rest on a participation theory; rather, the court found that a special fiduciary duty ran from the director to the victim of the misappropriation. *Id.* at 825. The corporation was a reinsurance brokerage, which owed a fiduciary duty to its client to hold the client's funds in trust, which it failed to do. *Id.* There, the victims "could have assumed rightfully that [the director], as a director of a reinsurance brokerage corporation, would not sanction the comingling and the conversion of loss and premium funds for the personal use of the principals of [the corporation]." *Id.* But none of the Affiliated Control Entities, or their directors, owed that kind of special fiduciary relationship to SSC, which was essentially a vendor.

In this connection, SSC points to the sweeps into the Concentration Account. Those sweeps were enabled, to be sure, by the Cash Management Master Agreement, which was signed on behalf of the Affiliated Control Entities by Neal, as "Principal" of CEG. (Neal Decl. at 17). The sweeps as such, however,

16

were not tortious. If a tort occurred, it might have consisted, for example, of CEG's receipt of monies (which otherwise would have been available to pay SSC) by means of misleadingly characterized "management fees." *Id.* As discussed above, there is no evidence that Neal authorized or participated in those acts.

SSC equates the alleged commission of torts against SSC with the commingling of funds. Commingling may support a claim that the corporate veil should be pierced, but is not in itself a tortious act against SSC. And the participation theory of tort liability depends of course on Neal's participation in the commission of such a tort.

SSC has not put forward any evidence that could raise a genuine dispute as to whether Neal participated in tortious conduct against SSC. Accordingly, summary judgment is appropriate and Count III is dismissed as to Neal individually.

### C. Count IV: Fraudulent Transfers Under N.J. Stat. Ann. § 25:2-25(a)

SSC claims in Count IV that Neal's use of CEG funds to pay personal expenses, the 2009 distribution, and the sweeps into the Concentration Account (collectively, the "Transfers") constituted fraudulent transfers in violation of N.J. Stat. Ann. § 25:2-25(a). To this list, SSC in its briefing adds the payment of management fees.

N.J. Stat. Ann. § 25:2-25 provides as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J. Stat. Ann. § 25:2-25.

SSC, as the party seeking to set aside a transfer as fraudulent, bears the burden of proof. *Gilchinsky v. National Westminster Bank N.J.*, 732 A. 2d 482, 489 (N.J. 1999). The transfer must be proven fraudulent by clear and convincing evidence. *Barsotti v. Merced*, 788 A. 2d 802, 811 (N.J. Super. Ct. App. Div. 2002). A finding of actual intent to defraud depends on whether "badges of fraud" are present. *Id.* Courts are to focus on the badges of fraud that are present, "not whether some factors are absent." *Id.* at 489-490. The presence of badges of fraud allows the court to make an inference that actual intent to defraud existed. *See id.* at 490.

The relevant badges of fraud are identified in N.J. Stat. Ann. § 25:2-26:

In determining actual intent under subsection a. of R.S. 25:2-25 consideration may be given, among other factors, to whether:

a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer;

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

As an initial matter, the statute only contemplates transfers from a *debtor*. "Debtor" is defined under this statute as "a person who is liable on a claim." N.J. Stat. Ann. § 25:2-21. Neal is indisputably not the debtor—TFS is. SSC has not cited any authority interpreting the statute to apply to a minority owner such as Neal. For fraudulent transfers, courts focus on the transfer itself, and whether the debtor put something owed to a creditor out of reach. *See Gilchinsky*, 732 A. 2d at 488. *Gilchinsky* did state in dictum that the court should consider whether "the debtor [*or person making the conveyance*] has put some asset beyond the reach of creditors . . . ." *Id.* (quotations and citations omitted; emphasis added). In an abundance of caution, I will therefore consider whether the "badges" of fraud are present in any transfers by the debtor, TFS, that allegedly were made or caused by Neal.

As to the alleged personal payments from CEG to Neal and the 2009 distribution, there is no actionable claim under the statute. These payments did not come from the debtor entity, TFS, at all. The personal payments are accounted for in CEG's general ledger, and the 2009 distribution came from CBS.

The management fees did originate from the debtor, TFS. There is no evidence, however, that Neal was involved in the payment of those management fees. SSC claims, at best, that he indirectly benefited from them. But it is the originator of the transfer, the debtor fraudulently avoiding payment of the debt, which is the subject of this statute.

That leaves the sweep payments. The only Section 26 factors that are potentially applicable to the sweeps are (e), (i), and (j). But even these are not present in a meaningful way. Regarding 26(e), it is true that the sweeps consisted of substantially all of TFS's assets, at least temporarily, until more payments came in. And, as for 26(i), TFS may have been technically "insolvent" for a period of time after the payments from Macerich were swept into the Concentration Account. Finally, as to 26(j), while some of the transfers occurred shortly after a substantial debt was incurred (the TD Bank Loan), most occurred months and years later. But this contractual arrangement went

19

on for multiple years without problems. Although the monies went into the Concentration Account, they were apparently allocated proportionately pay the debts of TFS, so it cannot be said that the sweep arrangement was fraudulent *per se*. The situation is not fundamentally different from that of any company whose cash on hand fluctuates in rhythm with accounts receivable and payable.

Moreover, any connection between the sweeps and Neal is attenuated. It is undisputed that these transfers went to pay off the TD Bank Loan, not to Neal personally. Even assuming that Neal was in some sense responsible for the sweeps (a fact he denies), there is no evidence that Neal made the sweeps with the intent to perpetrate a fraud against SSC on behalf of TFS.

On this record, I hold that a reasonable jury could not find that SSC has proven a fraudulent transfer under the standards of N.J. Stat. Ann. § 25:2-25(a). Summary judgment is granted in favor of Neal on Count IV.

### D. Count V: Fraudulent Transfer Under N.J. Stat. Ann. § 25:2-25(b)

In Count V, SSC alleges that the Transfers were constructively fraudulent under N.J. Stat. Ann. § 52:2-25(b).

As an initial matter, Neal notes that any Transfers made prior to June 18, 2011 (including, most importantly, the 2009 distribution) are time-barred under N.J. Stat. Ann. § 25:2-31. That section imposes alternative limitations periods:

> A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:
>
> a. Under subsection a. of R.S.25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;
>
> b. Under subsection b. of R.S.25:2-25 or subsection a. of R.S.25:2-27, within four years after the transfer was made or the obligation was incurred; or
>
> c. Under subsection b. of R.S.25:2-27, within one year after the transfer was made or the obligation was incurred.

N.J. Stat. Ann. § 25:2-31.

The constructive fraud claims arise under subsection (b) of § 25:2-25. The action was brought (i.e., the complaint was filed) on June 18, 2015. (ECF No. 1). The only transfers that are captured by the statute, then, are those that were made within the four years preceding the filing of the complaint—i.e., after June 18, 2011. N.J. Stat. Ann. § 25:2-31(b).[7]

As with the preceding count, there is no evidence that Neal was the conveyor of the management fees. The only Transfers made by the actual debtor entity that Neal allegedly participated in were the sweeps into the Concentration Account. Given the statute of limitations, I consider only those sweeps made after June 18, 2011.

Section 25(b) requires that the transfer be made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer." Under the statute, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." N.J. Stat. Ann. § 25:2-24(a).

The purpose of the sweeps into the Concentration Account was to pay down the debt owed by the Affiliated Control Entities pursuant to the TD Bank Loan. TSF was a borrower under the TD Bank Loan. The sweep payments therefore constitute the satisfaction of an "antecedent debt." There is no evidence to suggest that the amount of debt satisfied as a result of the sweeps

---

[7]    Neal also argues that the four year time-bar applies to transfers under subsection (a) as well, since the allegedly fraudulent transfers were actually discovered by the claimant more than one year before the filing of the complaint. (Def. Br. at 22 n. 5). The argument is that while SSC claims it only discovered the transfers upon the official issuance of the 2014 Midkiff Report, it must have been aware of the transfers prior to then. I need not consider the merits of this statute of limitations argument, since I have found that summary judgment ought to bar all fraudulent transfer claims under subsection (a).

was anything other than identical to the amount of the transfer. This would be "reasonably equivalent value" under the statute.[8]

Accordingly, the sweeps were not constructively fraudulent under Section 25(b). Because no other applicable transfers are attributable to Neal personally, I therefore grant summary judgment in favor of Neal as to Count V.

### E. Count VI: Fraudulent Transfers Under N.J.S.A § 25:2-27(a)

SSC also seeks recourse through N.J. Stat. Ann. § 25:2-27(a), which provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

N.J. Stat. Ann. § 25:2-27(a).

The same issues apply to this claim as to the fraud claims in Counts IV and V. Of the Transfers, Neal was only potentially involved with the sweeps, for which reasonably equivalent value was received. Accordingly, I grant summary judgment in favor of Neal as to Count VI.

### F. Count VII: Breach of Fiduciary Duty

SSC claims that Neal, as a director of CEG, breached the fiduciary duty he owed to SSC as a creditor of the Affiliated Control Entities.

In New Jersey, directors take on a fiduciary or "quasi-trust" duty to the corporation's creditors once the corporation becomes insolvent. *Board of Trustees of Teamsters Local 863 Pension Fund. V. Foodtown, Inc.*, 296 F. 3d 164, 173 (3d Cir. 2002) (citing *AYR Composition, Inc. v. Rosenberg*, 261 N.J.Super. 495, 501, 619 A.2d 592 (N.J. Super. Ct. App. Div.1993)). Part of

---

[8]   A potential wrinkle, though not one argued by SSC, is that TFS was released as a borrower under the TD Bank Loan on or about December 31, 2012. (Di Iorio Decl., Exh. A ¶ 6). The only evidence that TSF transferred money to the Concentration Account, however, dates from calendar year 2012, not thereafter.

that obligation is the directors' special duty not to favor their own interests over those of creditors. *Id.*

However, Neal is not alleged to be a director of TFS, the actual debtor. He is a director and minority shareholder of TSF's parent company, CEG. The question, then, is whether a director of a parent company owes a fiduciary duty to the creditors of a wholly owned subsidiary (assuming it has become insolvent). SSC has not provided, nor am I able to discover, any New Jersey case answering that question in the affirmative. One case in this district discussed a related issue. In *Katz v. Holzberg*, No. 13-1726, 2013 WL 5523488 (D.N.J. Oct. 2, 2013), Judge Hochberg analyzed the logic of a Florida bankruptcy case that allowed for that type of liability under Delaware law. *Id.* at *4-*5 (discussing *In re TOUSA, Inc.*, 437 B.R. 447, 460 (Bankr. S.D. Fla. 2010)). While *Katz*, for unrelated reasons, did not ultimately apply that principle of liability, it did not reject its application outright. Still, as authority *Katz* is weak.

The Third Circuit has not weighed in on this particular issue. It has, however, more generally discussed the unity of interest between parent corporations and their subsidiaries. In a case regarding attorney-client privilege, the court surveyed contexts in which parent companies are presumed to have a unity of interest with their wholly owned subsidiaries. Those contexts include Sherman Act liability, tortious interference, and regulatory disclosures. *In re Teleglobe Communications Corp.*, 493 F. 3d 345, 369-371 (3d Cir. 2007). There also exist theories governing a parent corporation's potential liability for the torts of a wholly-owned subsidiary. *See., e.g., Ventron*, 468 A. 2d at 463 (listing the two factors determinative of such parent-subsidiary tort liability: grossly inadequate capitalization and substantially exclusive business with the parent corporation).

All of these analyses, however, stop well short of holding that directors owe a fiduciary duty to the creditors of their corporation's subsidiaries. SSC's argument is that Neal, as a director of CEG, had a duty to discover that TSW

was paying illusory management fees to CEG, depleting the resources available to pay TSF's creditor SSC, and to the benefit, at least indirectly, of himself as guarantor. But, even assuming that TSF was in fact insolvent—a predicate for a director's fiduciary duty to a creditor—I see no New Jersey precedent for imposing such a duty on Neal as director of the creditor's parent corporation. I therefore grant summary judgment in favor of Neal as to Count VII.

### G. Count VIII: Unjust Enrichment

SSC claims that as a result of "improper transfers" (again, the sweeps, the 2009 distribution, and the payment of management fees), Neal has been unjustly enriched. These arguments appear to apply generally to the defendants, not just to Neal, but Neal is of course the movant here.

A claim for unjust enrichment requires a plaintiff to show that the "defendant received a benefit and that retention of that benefit without payment would be unjust." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A. 2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554, 641 A. 2d 519 (N.J. 1994)). This doctrine is quasi-contractual, and additionally "requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* "Recovery on the theory of quasi-contract was developed under the law to provide a remedy where none existed." *Callano v. Oakwood Park Homes Corp.*, 219 A. 2d 332, 335 (N.J. Super. Ct. App. Div. 1966). A classic example is *DeGasperi v. Valicenti*, 181 A. 2d 862 (Pa. Super. Ct. 1962) (cited in *Callano*), where the builder of three houses hired a contractor to perform work on them. As it turned out, the houses were owned by the builder's wife. The court permitted recovery on the theory that the wife as owner would be unjustly enriched if permitted to retain the benefit of the work. *Id.* at 864.

Courts in this district have recognized a requirement that "some direct relationship should exist between the parties to an unjust enrichment claim . . . ." *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 200

(D.N.J. 2012). The requirement of a direct relationship "is simply meant to preclude a plaintiff from seeking recovery from a defendant whose involvement is too far removed or too attenuated from the facts and circumstances giving rise to the plaintiff's claims." *Id.*[9]

Neal's involvement in the events underlying the SSC's contract claim against TSC is attenuated, and SSC did not confer any direct benefit on him that gave rise to a legitimate expectation of a reward from Neal.

The contract was between SSC and TFS—an entity that Neal was not even a director of. There is no evidence that Neal was involved in any aspect of the relationship between SSC, TFS, and Macerich. Nor is there any evidence that he was behind the actual harm to SSC—TFS's breach of contract. There is no factual basis for the proposition that SSC conferred any benefit in the vain expectation of remuneration from Neal. Indeed, it is not clear that Neal received any benefit from the two months of unpaid services rendered by SSC in 2012. Certainly the 2009 distribution long predates the May 2012 breach of contract, as does the 2009–10 payment of management fees. (Lipman Cert., Exh. A, Attachment 3). Evidence that the sweeps may have been ongoing in 2012 does not necessarily lead to the inference that they benefited Neal in any direct way; at most it might be argued that, by furnishing the means to keep current on the TD Bank loan, they may have staved off any personal liability as guarantor.

Neal was an indirect minority shareholder of TFS. There is no basis for this court to find a relationship of quasi-contract between TFS and Neal. Nor is this a situation in which a somewhat removed party must be held liable because there is no other available source of compensation for the plaintiff. SSC can seek a remedy for its breach of contract against TFS, the Affiliated Control Entities, or even Edward. It can even seek, as it has done in this action, to pierce the corporate veil as to Neal.

---

9    In *Stewart,* a plaintiff who had purchased a falsely advertised beverage from a retailer asserted a claim of unjust enrichment against the manufacturer. The court permitted the claim, because the misrepresentation was contained in the manufacturer's national advertising campaign; the manufacturer, though it had profited indirectly, had actually committed the wrongful act.

Unjust enrichment is a poor fit for these facts. I grant summary judgment in favor of Neal on Count VIII.

### III.  Conclusion

For the reasons set forth above, Neal's motion for summary judgment (ECF no. 66) is **GRANTED** as to Counts III through VIII and **DENIED** as to Count II.

As to Neal, the case now comes down to this. Under Count I, plaintiff seeks to hold him directly liable for breach of the settlement agreement. Under Count II, plaintiff seeks to hold him indirectly liable for the underlying obligation on an alter-ego theory. As veil-piercing is an equitable theory, a wide range of circumstances, including those underlying the dismissed counts, may turn out to be relevant.

Dated:  March 2, 2020

HON. KEVIN MCNULTY, U.S.D.J.